<hr/>

## GEORGE PATTERSON *v.* J. B. D'AUTRIVE et als.

Rights of voters, under the Act "to regulate Elections in the Parishes of Orleans and Jefferson," approved January 25th, 1847.

Commissioners of election who refuse to receive a vote, in consequence of their belief that the residence of the applicant does not entitle him to that right, cannot be held liable for damages on account of such refusal.

Where a person offering to vote shall be challenged, or the commissioners shall be in doubt as to his qualifications, they shall administer the oath prescribed by law; if he take this oath, it is the test of his qualification, and his vote must be received, unless perhaps the falsity of the oath be established. If the commissioners reject the vote and, on demand of the applicant, refuse to tender the oath, they are liable to him in damages for such refusal. *Campbell*, J., dissenting.

APPEAL from the District Court of the Parish of Jefferson, *J. Calvitt Clarke*, J. *Jourdan & Warfield*, for plaintiff and appellant. *Marks*, for *D'Autrive. Upton*, for *Waters. Purvis & Dugué*, for *Boutté*.

SLIDELL, C. J. The vote of the defendant was rejected on the ground that he was not a resident of the Parish of Jefferson. There was no doubt as to the locality of plaintiff's dwelling, but the question was whether the locality was within the boundary line of the Parish of Jefferson. If the commissioners really believed that it was not, we do not think they can be held liable in damages to the plaintiff. When we find the District Judge deciding on evi-

PATTERSON
v.
D'AUTRIVE ET ALS.

dence, an important portion of which was before the commissioners, that the plaintiff's dwelling was clearly in Lafourche, we are not prepared to say the commissioners did not really entertain the same opinion.*

In coming to the conclusion to affirm the judgment, we wish by no means to be considered as approving the conduct of the commissioner, *D'Autrive*, noticed in the opinion of Mr. Justice Campbell.

Judgment affirmed, with cost.

VOORHIES, J., BUCHANAN, J., and OGDEN, J., concurring.

CAMPBELL, J., dissenting. The plaintiff alleges that he has been damaged by the acts of defendants, who were commissioners appointed to hold a general election at the precinct of the Barataria settlement, on the 5th of November, 1849. He avers that he was then, and now is, a resident of said precinct, and qualified to vote for the officers then to be elected; that on the day of said election, while the polls were open, and within the hours designated by law, he presented himself and offered to vote, and tendered his ballot to said commissioners, who refused to receive it, alleging that he was not a legally qualified voter; that he thereupon proffered to take, and demanded of defendants that they should administer the oath in such case prescribed by law, which they refused, maliciously intending thereby to deprive him of his rights as a citizen and voter. Further alleging, that the motive of said commissioners in rejecting his vote, and refusing to administer the prescribed oath, was to intimidate him, and compel him, under the penalty of disfranchisement, to vote as they wished; he claims damages in the sum of one thousand dollars, which he alleges he has sustained from their wrongful acts.

To this petition, an exception was filed, which was sustained by the Court, chiefly on the ground that the action could not be maintained, inasmuch as the commissioners, in rejecting the vote of plaintiff, adjudicated upon a matter over which, by law, they have exclusive jurisdiction. On appeal, this judgment was reversed, and the case remanded for further proceedings. 6 An. 867.

The case is now before us, on an appeal upon the merits. The defendants, *D'Autrive* and *Boutté*, admitting that they acted as commissioners, deny that they were actuated by malice, and aver, that they were influenced in rejecting the vote of petitioner, solely by the desire conscientiously to discharge their duties. Respondent, *Waters*, further avers, that he relied upon the representations of his co-defendants, who stated that to their knowledge and belief, plaintiff was not entitled to a vote.

Judgment was rendered in favor of defendants, and plaintiff has appealed.

The defence, then, resolves itself into two grounds:—1st. That plaintiff not being a resident of the Parish of Jefferson, was not entitled to vote. 2d. That

---

* *Extract from judgment of District Court.*—" On the trial, evidence was introduced on both sides, to ascertain and determine the true boundary that divides the Parish of Jefferson from that of Lafourche. The plaintiff resided on the west or right bank of Little Lake. The defendants contend that the right or western shore of Little Lake lies wholly within the boundaries of Lafourche, and that plaintiff is, therefore, a resident of that parish—where alone he is entitled to the right of suffrage. In this position the commissioners are fully sustained by the map of General Bernard and Major Poussin, made in 1817, by that of Lafon, and by the testimony of witnesses familiar with the Barataria region, who attest the accuracy of these surveys. To contradict this array of proofs, the plaintiff relies on La Tourrette's map. It was shown that La Tourrette has copied all his lines and boundaries from the survey of General Newcomb. The person last named, is notorious as a fugitive from justice to avoid a prosecution for forgery His surveys are entitled to no credit, when contradicted by those of distinguished engineers like Bernard, Poussin and Lafon, corroborated, as they are, by eye-witnesses well acquainted with the localities.

" We are satisfied by the evidence, that the west or right bank of Little Lake, is within the bounds of the Parish of Lafourche."

if he was entitled to vote, they refused him the exercise of the right, not from malice, but in the conscientious discharge of their duty, and are, therefore, excusable.

As respects the residence of the plaintiff, much evidence has been introduced.

It appears from the testimony of witnesses, that since 1845, plaintiff resided on Little Lake, where he now lives; that he claimed to be a resident of the Parish of Jefferson; that he was assessed in that parish, and previously to the election of 1849, had voted there; and that, until that time, the right of persons living in his neighborhood to vote, was never questioned. It further appears, that process from Justices' Court in the Parish of Jefferson, was executed on the west side of Little Lake, which defendants claim to be within the parish of Lafourche, and that petitioner was subsequently appointed and acted as commissioner of elections in the Parish of Jefferson. It is likewise in evidence, that after the rejection of plaintiff's vote, some of his neighbors, who live west of him, offered to vote in the Parish of Lafourche; that their votes were refused.

This testimony, it must be conceded, furnishes strong *prima facie* evidence that plaintiff was a resident of the Parish of Jefferson.

Defendants seek to destroy its effect, by the production of maps and the application of the oral testimony of witnesses to them.

The maps of Bernard, Poussin and Lafon, and La Tourrette, together with a copy of the approved government survey of the township in which is situated the residence of plaintiff, has been exhibited. In these maps, as in the testimony of witnesses sought to be applied to them, there are conflictions.— The more ancient maps, seem to sustain the hypothesis of defendants; while from the map of La Tourrette and the government survey, it would seem that the residence of plaintiff is in the Parish of Jefferson. The testimony on this part of the case, is vague and unsatisfactory. To establish their defence as against the presumptions in plaintiff's favor, resulting from his acts and averments—at times not suspicious—the general impression among his neighbors—assessment—previous voting—holding office, &c.—it devolved upon them to prove that he resided out of the Parish of Jefferson. This they have not done, though the fact, if it existed, was susceptible of easy proof.

2d. Did the defendants, on refusing the vote of plaintiff, act maliciously? Or, in other words, was their act in so doing, wrongful and without just cause?

The 15th section of the Act "to regulate elections in the Parishes of Orleans and Jefferson," approved January 25, 1847, (page 9 of Session Acts,) prescribes, "That it shall be the duty of the commissioners to receive the ballots of all legal voters, who shall offer to vote, deposit the same in the ballot-box, to be provided for that purpose," &c. The next section prescribes that, "When a person offering to vote shall be challenged, or the commissioners shall be in doubt as to his qualifications, they shall administer to the person so offering to vote, the following oath or affirmation." Here follows the oath, which embraces all the legal qualifications of a voter, and in taking it, the party offering to vote swears, among other things, " that he has resided in the State two consecutive years preceding the election, and the last thereof in the parish in which he offers to vote." In the 17th section, it is expressed, " That should any person offering to vote, refuse to take and subscribe to the oath presented, his vote shall be refused by the commissioners." The next section denounces against those who may swear falsely in the premises, the penalties of perjury.

Thus it appears, that the law, while it seeks to guard the purity of the ballot box, by punishing fraudulent voters, likewise protects the citizens entitled to suffrage, in the enjoyment of this privilege, by prescribing the mode in which his right to exercise it, shall be ascertained in case it be questioned. Except in cases of disqualification from crime, the oath is the test. If he refuse to subscribe it, his vote must be rejected; if he take it, his vote must be received, unless, perhaps, the falsity of the oath be established, for which, however, the law makes no provision.

But it is urged, that the oath is only resorted to in case the person offering to vote is challenged, or the commissioners are in doubt as to his qualifications. That in this case there were no doubts, as the commissioners knew that plaintiff was disqualified. Their belief could not deprive defendant of his right to establish his qualification in the manner prescribed by law. The interpretation contended for, is the evil one which would destroy the spirit of the law. The commissioner should, upon the demand of plaintiff, have tendered the oath, and if taken, should have received his vote, unless the oath was proved to be false.

The refusal to receive the oath, would not, of itself, subject the commissioners to damages, ; for if it should appear that the party offering was not entitled to vote, it would be *damnum absque injuria.* It is otherwise, however, if by the wrongful refusal to administer the oath, a person entitled to vote is denied that right. This deprivation is a wrong, which carries damage with it.

In the case of *Spraggins* v. *Haughton,* 2 Scammon, p. 377, the Supreme Court of Illinois, in examing the act regulating elections in that State, which act contains a proviso, that when a person shall offer to vote, "if either of the Judges shall *suspect* that he does not possess the requisite qualifications of an elector, or if his vote shall be challenged," the Judges shall tender such person an oath, decide in effect, that, if the party offer to swear, his oath must be received; that "they have no discretionary power: for the law is imperative that the vote should be received, unless evidence is produced that the oath is false." We think that the oath in such case provided, should have been administered as prescribed by law.

In the case of *Bridge* v. *Oakey,* 2 An. 968, it was held, that "an inspector is not answerable in damages, for a mere error in judgment in rejecting a voter, when his motives are upright." It must appear, says the Court, that he acted fraudulently or maliciously. "To constitute malice, the act must be a wrongful one, done intentionally, without just cause or excuse." Personal illwill is not essential to its existence; and, in the absence of any declared intention, the motive may be inferred from the circumstances attending the act."

The refusal of the commissioners to receive the vote, without tendering the oath, as has been seen, was illegal, and therefore wrongful. We will now inquire into their motives, so far as they can be gathered from the attending circumstances.

It appears from the testimony, that the election excited a great deal of interest, in which the commissioners participated; that one of the candidates was a brother-in-law of *D'Autrive,* a commissioner; that *D'Autrive* delivered to *Patterson* some tickets, to be distributed by him among his friends living about Little Lake; that upon *Patterson's* saying he had come to vote, *D'Autrive* replied, "very well, I think you vote as usual;" that *Patterson* said, "old man

*Short* is a candidate for assessor," and *D'Autrive* replied, "if you support *Bouligny*, we shall vote for *Short;*" also, "that if he would vote for *Bouligny*, he would be allowed to vote;" with much other evidence of the same character.

From this, and other testimony contained in the record, I am constrained to conclude, that in rejecting the vote of plaintiff, the commissioners did not commit an error of judgment alone, but that they were influenced in their decision by improper motives.

It has been well said by Chief Justice Parker, in *Lincoln* v. *Hopgood*, "That the right of voting in such a government as ours, is a valuable right; it is secured by the Constitution; it cannot be infringed without producing an injury to the party; and although the injury is not of a nature to be effectually repaid by a pecuniary compensation, yet there is no other indemnity which can be had." Again, he says: "In cases in which it should be made apparent that there was a wilful deviation from duty, and a wanton rejection of a vote from party motives, or from personal hostility to a citizen whose vote was refused, or even a negligence or inattentive examination of his claim, exemplary damages would be required as a compensation to the injured party, and an expiation of the high and aggravated offence against the civil and political privileges of the citizen."

Lord Holt, in the case of *Ashly* v. *White et al.*, Ld. Ray, 938, (reported in 1 Smith's Leading Cases, p. 247,)—"A right that a man has to give his vote at the election of a person to represent him in Parliament, there to concur in the making of laws which are to bind his liberty and property, is a most transcendent thing, and of an high nature; and the law takes notice of it as such." He adds: "If public officers will infringe men's rights, they ought to pay greater damages than other men, to deter and hinder other officers from the like offences." Upon the argument of the same case before the House of Lords, Lord Holt says: "Let all people come in to vote fairly; it is to support one or the other party to deny any man's vote. By my consent, if such an action comes to be tried before me, I will direct the jury to make him pay well for it; it is denying him his English right." With more force may it be said, that to reject the vote of a citizen of this country, who is a qualified elector, is to deprive him of his American right.

I am, therefore, of opinion, that as regards the defendants, *D'Autrive* and *Boutté*, the judgment of the District Court should be reversed, and judgment rendered in favor of plaintiff. And it appearing that the defendant, *Waters*, was willing to administer the oath, but was overruled by the other commissioners, his co-defendants, that, as to him, the judgment should be affirmed.